**CONSOLIDATED ELECTRODYNAMICS CORPORATION, a corporation, Appellant,**

v.

**MIDWESTERN INSTRUMENTS, Inc., a corporation, Appellee.**

**No. 5852.**

United States Court of Appeals Tenth Circuit.

Oct. 24, 1958.

---

Ashley Stewart Orr, Pasadena, Cal. (Christie, Parker & Hale, James B. Christie, Robert L. Parker, C. Russell Hale, Pasadena, Cal., Richard B. Hoegh, Los Angeles, Cal., M. Roy Spielman, Los Angeles, Cal., Martin, Logan, Moyers, Martin & Hull, Villard Martin, and Robert S. Rizley, Tulsa, Okl., on the brief), for appellant.

Gordon D. Schmidt, Kansas City, Mo. (Robert J. Woolsey, Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl., and C. Earl Hovey, Kansas City, Mo., of counsel, on the brief), for appellee.

Before MURRAH, PICKETT and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Appellant, Consolidated Electrodynamics Corporation, sued appellee, Midwestern Instruments, Inc., [1] alleging contributory infringement of its United States Patent No. 2,599,661 which is known as the Richardson patent and which covers a "suspension galvanometer and magnet assembly." Consolidated had granted Midwestern a nonexclusive license to make and sell galvanometers and magnet assemblies under this patent. Midwestern then manufactured and sold certain galvanometers and a galvanometer carrier and paid royalties thereon. Consolidated returned the royalties paid on the galvanometer carrier and claimed contributory infringement arising from the manufacture and sale of this device. Midwestern asserted the license agreement as a defense and also said that the patent was invalid and that there was no contributory infringement. A hearing was first had on the issue of whether the license agreement was a defense. This was determined adversely to Midwestern. A final hearing was then held on the issues of whether Midwestern was estopped by the license to question patent validity, whether the patent was valid, and whether there was contributory infringement. These issues were decided against Consolidated and it has now appealed.

The devices involved in this controversy are adapted for use in recording oscillographs which have as their purpose the production of records of changes in electrical currents. A common use is in seismograph equipment of the type utilized in geophysical surveys. Such oscillographs are usually provided with a bank of galvanometers placed in a magnet assembly. More than one galvanometer is used so that different currents may be recorded simultaneously.

Each galvanometer element includes a coil suspended in the magnetic gap formed by two pole pieces. The coil is suspended by torsion wire which resists torque produced by the interaction of the magnetic field with the current passing through the coil. The coil deflection is a measure of the current strength. To indicate the deflection of the moving coil a mirror is mounted on the coil suspension system so as to be deflected with movement of the coil in the magnetic field. Movement of the mirror deflects a beam of light reflected from the mirror. This reflected light is focused on a moving photosensitive surface so that the movements of the coil are reproduced thereon. For the apparatus to function properly there must be an alignment of the reflecting mirrors so that the light beams from all of them fall in a common straight line in the plane of the photographic medium.

The Richardson patent, on which Consolidated relies, has claims directed to complete galvanometers and to a combination of a galvanometer and magnet block with means to adjust and hold in place the galvanometer. Prior to the issuance of the Richardson patent on June 10, 1952, Midwestern made and sold galvanometers designated as Mid-

---

1. The parties will hereinafter be referred to as Consolidated and Midwestern respectively.

western models 107 and 109. These fitted into the magnet base made by Consolidated and could be used therein. The manufacture of 107 ended prior to June 10, 1952, but the manufacture and sale of 109 continued until 1955 and was the subject of a dispute between Consolidated and Midwestern. On August 3, 1953, Consolidated granted Midwestern a non-exclusive license under the Richardson patent. In 1954 Midwestern began making and selling devices designated as Midwestern model 112 galvanometer carriers. This model 112 was a metal case having a pair of rectangular pole pieces extending outwardly from opposite sides and capable of use in magnets such as Consolidated's with opposed rectangular slots. The 112 also had a cylindrical cavity to receive and permit the horizontal rotation of a standard, tubular galvanometer such as Midwestern model 102.[2] Midwestern included its sales of 112 in its royalty reports and payments to Consolidated. As the 112 carrier sold at a substantially less price than the 109 galvanometer the royalty payments were reduced.

Consolidated claims that the manufacture and sale of the 112 carrier by Midwestern is a contributory infringement of the Richardson patent in violation of 35 U.S.C. § 271(c).[3] The theory is that the 112 carrier, which is not an article or commodity of commerce suitable for substantial noninfringing use, has no function other than to receive the 102 galvanometer element and that the two when assembled infringe the Richardson patent.

While Midwestern asserted that the license agreement covered the 112 carrier and hence its acts were permitted, this defense was rejected by the trial court and has not been presented in this appeal. The basic position of Midwestern is that the Richardson patent is invalid.

Consolidated insists that Midwestern is estopped by the license agreement to contest the validity of the Richardson patent. The general rule is that a licensee under a patent license agreement may not challenge the validity of the licensed patent in a suit for royalties due under the contract.[4] Here we have a suit for infringement, not a suit for royalty. Midwestern consistently took the position that its manufacture and sale of the 112 carrier was within the license agreement. It reported sales and paid royalties. In this suit it set up the license agreement as a defense. Consolidated returned the royalties on the 112 carrier, sued for infringement, and successfully contended in the lower court that the license agreement did not cover the 112 carrier.

The situation is one in which Consolidated seeks to retain every advantage of the license agreement and to avoid every burden that might be imposed thereby. The license agreement was to the mutual advantage of each party. Midwestern received the protection of the license and freedom from the claim and consequences of infringement. Consolidated avoided the risk of patent invalidation in an infringement suit. Midwestern has consistently claimed the protection afforded by the license. Consolidated would take away that protection but retain the right to use the license to defeat a charge of patent invalidity.

■■ By suing Midwestern for infringement Consolidated took the position that the license did not apply to the 112 carrier. Consolidated may not at the same time insist that the license is operative to prevent Midwestern from assert-

2. The 102 galvanometer, which is covered by the Morrow Patent No. 2,439,576, does not have extended pole pieces.

3. The statute reads thus: "Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

4. Automatic Radio Manufacturing Co., Inc., v. Hazeltine Research, Inc., 339 U. S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312.

ing the invalidity of the patent in this suit based on contributory infringement by the manufacture and sale of the 112 carrier.[5] The license raises no estoppel with respect to an article which it does not include within its terms. As to an article which is not within the class licensed, the licensee takes nothing by the license, has no immunity from suit and assumes no obligation to recognize the validity of any patent.[6]

For a further ground of estoppel, Consolidated relies on the representations by Midwestern to the public that the 112 carrier was produced under, and licensed by the owner of, the Richardson patent. Such representations were made by statements in advertising literature and by the imprint of the Richardson patent number on the 112 carrier. There is nothing to show that in so doing Midwestern acted fraudulently or in bad faith.[7] The license agreement required "proper patent marking" and did not forbid reference to the patent in connection with the sale of the licensed devices. Midwestern has consistently taken the position that the license included the 112 carrier. This is not a case such as Regina Music Box Co. v. Newell, 2 Cir., 131 F. 606, where defendants in an infringement suit continued to place the "patent stamp" on articles after the termination of a license agreement and then incon-sistently contended that the termination of the license agreement gave them the right to assert patent invalidity. The inconsistency in this case is on the side of Consolidated. It successfully maintained that the 112 carrier is outside the license agreement and now seeks to use the same license agreement to estop Midwestern from attacking the validity of the patent. This it may not do.[8]

While the grant of a patent creates a presumption of validity[9] and that presumption is enhanced by the fact that the patent in suit was granted after consideration by the Patent Office of the patents relied upon by Midwestern as an anticipation,[10] the presumption is rebuttable.[11] The ultimate question of validity is one of law for the court to decide.[12] The burden of establishing the invalidity of a patent rests upon the party asserting it.[13] One who relies on anticipation to defeat patentability must sustain that anticipation by clear and convincing proof.[14]

To be patentable an invention or discovery must be of a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof",[15] but the differences between the subject matter and the prior art must be such that the subject matter as a whole would not have been "obvious at the time the invention

5. Cf. N. S. W. Co. v. Wholesale Lumber & Millwork, Inc., 6 Cir., 123 F.2d 38, 41. See also Texas Rubber & Specialty Corporation v. D. & M. Machine Works, 5 Cir., 81 F.2d 206, 209, certiorari denied 299 U.S. 548, 57 S.Ct. 11, 81 L.Ed. 403; Bucky v. Sebo, 2 Cir., 208 F.2d 304, 305–306.

6. Cf. Sinko Tool & Mfg. Co. v. Casco Products Corporation, 7 Cir., 89 F.2d 916, 917.

7. Cf. Hazeltine Corporation v. Abrams, D. C., 7 F.Supp. 908, 910.

8. Indiana Mfg. Co. v. Nichols & Shepard Co., 6 Cir., 190 F. 579, 584.

9. Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7–8, 55 S.Ct. 928, 79 L.Ed. 163.

10. Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, 1002, certiorari denied 305 U.S. 662, 59 S.Ct. 364, 83 L. Ed. 430. The Richardson patent shows references to the Redmond, Peters and Palmer patents hereinafter mentioned.

11. United States Air Conditioning Corporation v. Governair Corporation, 10 Cir., 216 F.2d 430, 432.

12. Blish, Mize & Silliman Hardware Company v. Time Saver Tools, Inc., 10 Cir., 236 F.2d 913, 916, certiorari denied 352 U.S. 1004, 77 S.Ct. 565, 1 L.Ed.2d 549.

13. 35 U.S.C. § 282.

14. Hollywood-Maxwell Co. v. Street's of Tulsa, 10 Cir., 183 F.2d 261, 263.

15. 35 U.S.C. § 101. Cf. Blish, Mize & Silliman Hardware Company v. Time Saver Tools, Inc., supra, at pages 914–915.

was made to a person having ordinary skill in the art to which said subject matter pertains." [16] The mere aggregation of old elements, such as the galvanometers and magnet assembly in this case, is not patentable when the respective individual functions of the assembled elements are not changed and produce no result other than the added results of such functions.[17] A combination of old elements is patentable if it accomplishes either a new result or an old result "in a more facile, economical, and efficient way in a particular environment which presented peculiar and difficult problems." [18]

Consolidated does not argue that the Richardson patent was the first to provide for an adjustable suspension galvanometer and magnet assembly.[19] Instead Consolidated urges that the Richardson patent is a significant improvement in galvanometer construction and advanced a highly developed art by an important and desirable change which required more ingenuity and skill than that possessed by the ordinary mechanic in the art.

The asserted novelty and significant improvement in the Richardson patent lies in the method of adjusting the vertical tilt of the galvanometer in the magnet assembly and of holding it in the selected position. Adjustability is not invention.[20] Here the claim goes not to mere adjustability but to the means of effecting that adjustability.

In Richardson, adjustment and retention are obtained by the use of a galvanometer having rectangular pole pieces resting on ledges of the magnet which is provided with cams to adjust the galvanometer and to hold it in adjusted position. Other patents in one way or another have made provision for tilting the galvanometer vertically and holding it in the selected position. Redmond, which had arcuate pole pieces, did this by a tie rod and set screw arrangement. Peters utilized opposed nuts on a bolt bearing against opposite sides of the galvanometer. Palmer provided a nut and spring on a bolt bearing against opposite sides of the galvanometer. The prior but unpatented Carter unit had arcuate pole pieces and a screw and spring assembly acting on a lateral arm secured to the galvanometer.

While counsel for Consolidated assert in their brief that the teachings of the prior art were deficient, cumbersome, and likely to cause distortion, no evidence was introduced to prove such deficiencies. An expert witness for Midwestern testified that the two cam arrangement of the Richardson patent was unsatisfactory as the cams had a tendency to crush the galvanometer. The record shows that Consolidated modified its magnet block so that the vertical adjustment of the tilt was attained by the use of one cam and an opposing spring assembly. On one side the cam engages the pole pieces through a slide bar. On the opposing side the pole pieces push against the spring. This revision does not come within the scope of the claims, or within the teachings, of the Richardson patent.

The claimed improvement in adjustment and retention of position is based on two changes, the substitution of rectangular for arcuate pole pieces and the use of a two cam or one cam and spring arrangement instead of the tie rod and set screw of Redmond, the opposed nuts on a bolt as shown by Peters, the nut and spring arrangement of Palmer or the screw and spring assembly of Carter.

16. 35 U.S.C. § 103.

17. Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110, 112.

18. Oliver United Filters v. Silver, 10 Cir., 206 F.2d 658, 662.

19. This was anticipated by Peters No. 1,-951,578, Palmer No. 2,268,526, Redmond No. 2,389,091, and perhaps others.

20. Karl Kiefer Mach. Co. v. United States Bottlers Machinery Co., 7 Cir., 114 F.2d 169, 173; Westinghouse Air Brake Co. v. Schwarze Electric Co., 6 Cir., 108 F.2d 352, 354; Spring-Air Co. v. Ragains, D. C., 96 F.Supp. 79, 90.

All that is presented is a change in shape or configuration of the pole pieces and a change in mechanical means for effecting and holding an adjustment. These should have been obvious to a person having ordinary skill in the art. The claimed improvements show no flash of genius,[21] no substantial innovation [22] and add nothing to the sum of useful knowledge.[23] Perfection of workmanship is not patentable.[24] The record before us shows, at the most, a change of doubtful desirability in the means of securing and retaining the adjustment of known elements which perform no new function and produce no new result, and this change shows only mechanical ability, not inventive genius.

Consolidated insists that the validity of the Richardson patent is shown by the willingness of Midwestern to enter into the license agreement. This is but another argument of the licensee estoppel theory which has been discussed. An officer of Midwestern testified that he thought the Richardson patent was invalid but that his company was willing to pay a small royalty rather than engage in expensive and time-consuming litigation. The payment of tribute through royalties was merely the price of peace.[25] A license agreement cannot breathe life into an invalid patent.

Finally, Consolidated says that the devices in question were a commercial success both to Consolidated and Midwestern and that commercial success strengthens the presumption of patent validity. While it is true that commercial success is some evidence of patent validity and in doubtful cases may be a deciding factor,[26] "no amount of commercial success can bridge the gap between mechanical skill and invention." [27]

The combination of a suspension galvanometer in a magnet assembly was well known to the art before the Richardson patent. Under that patent each element performs the same function and accomplishes the same result.[28] The use of rectangular pole pieces and cams to make and retain adjustment is no more than the extended application of an earlier idea and performs the same work, in the same way and without any better results.[29] The old combination cannot be repatented by the mere substitution of a new method of adjustment of an element of that combination for the old method of adjustment of the same element, particularly when there is no showing that the new method is an improvement or that the old method is unsatisfactory.[30]

We agree with the trial court that the Richardson patent is invalid. As an invalid patent cannot be infringed [31] it is unnecessary to consider the question of contributory infringement.

The judgment is affirmed.

21. Blish, Mize and Silliman Hardware Company v. Time Saver Tools, Inc., supra, 236 F.2d at page 915.

22. Sinclair & Carroll Co., Inc., v. Inter-Chemical Corporation, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644.

23. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162.

24. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58; Shaffer v. Armer, 10 Cir., 184 F.2d 303, 307.

25. Cf. Kleinman v. Kobler, 2 Cir., 230 F. 2d 913, 914, certiorari denied 352 U.S. 830, 77 S.Ct. 44, 1 L.Ed.2d 51.

26. Oliver United Filters v. Silver, supra, 206 F.2d at pages 663–664.

27. Shaffer v. Armer, supra, 184 F.2d at page 307; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U. S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973.

28. United States Air Conditioning Corporation v. Governair Corporation, supra, 216 F.2d at page 432.

29. Cf. Cole v. Hughes Tool Company, 10 Cir., 215 F.2d 924, 944.

30. Cf. Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549–550, 58 S.Ct. 662, 82 L.Ed. 1008; Bassick Manufacturing Co. v. R. M. Hollingshead Co., 298 U.S. 415, 425, 56 S.Ct. 787, 80 L.Ed. 1251.

31. Cummings v. Moore, 10 Cir., 202 F.2d 145, 147.